IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------

| | |
|---|---|
| EMERGENT BIOSOLUTIONS INC., | : |
| | : |
| Plaintiff, | : |
| | : |
| -against- | : Civil Action No. |
| | : |
| DANIEL D. ADAMS, AND | : |
| MANON M.J. COX, | : |
| | : |
| Defendants. | : October 3, 2008 |
| | : |

--------------------------------------------------------

## COMPLAINT

Plaintiff Emergent BioSolutions Inc. ("Emergent"), by its undersigned counsel, alleges as follows:

### Summary of Facts and Nature of Claims

1.      This case is about unfair business dealing, deception, and fraud on the part of defendants Daniel D. Adams and Manon M.J. Cox (together, "defendants" or "Management"). Adams is a Director of Protein Sciences Corporation ("PSC"), serves as the company's President and Chief Executive Officer, and is a PSC shareholder.  Cox is the Chief Operating Officer of PSC and is a PSC shareholder.  Adams and Cox are the only members of PSC's executive team.

2.      PSC is a pharmaceutical research and development company focused on the development of vaccine products based on a proprietary technology platform.  PSC's lead product candidate is an influenza vaccine candidate known as "FluBlok®."

3.      PSC has been struggling with a "go it alone" business strategy for many years, sustaining itself with funds from friends, family, customers, and others to support continued

product development.  Although private, the company has more than 400 shareholders, with more than 60 million shares outstanding.

4.      As its costs began to escalate, PSC sought financial backing for approximately two years from more than 150 venture capitalists and potential strategic partners.  By early 2008, PSC had exhausted its options for financial or strategic approaches that would permit PSC to continue stand-alone operations.

5.      As part of the pursuit of alternative financing options, PSC entered into strategic discussions with Emergent.  During those discussions, Adams represented to Emergent that PSC was in dire need of financial support.

6.      PSC, largely through Adams and Cox, made multiple misrepresentations to Emergent.  These misrepresentations were done to perpetuate their fraudulent scheme by leading Emergent to negotiate with PSC toward an asset purchase and to loan PSC $10 million in bridge financing that defendants represented was necessary to sustain PSC until the closing.  These misrepresentations included:

- Adams's statements that he supported the asset purchase and would facilitate the transaction by reaching out to major shareholders to obtain their votes;

- Cox's misrepresentations to Emergent that, once PSC obtained the bridge financing, she would facilitate the due diligence necessary for the transaction to move forward promptly.

- Adams's and Cox's misrepresentations to Emergent regarding the development status of FluBlok, including its readiness for market; and

- Adams's and Cox's misrepresentations to Emergent concerning the likelihood and timing of obtaining development funding for FluBlok from the Biomedical Advanced

- 2 -

Research and Development Authority of the U.S. Department of Health and Human
Services ("BARDA"), and the magnitude of such funding.

7.      Based on these representations, Emergent agreed to pursue the transaction and to
provide up to $10 million in bridge financing to sustain PSC's operations while the transaction
was being finalized.

8.      Emergent and PSC entered into three main agreements regarding the transaction.
Two were signed by Adams himself on behalf of PSC—a Letter of Intent dated February 5, 2008
and supplemented February 18, 2008 ("LOI"), and a Loan and Security Agreement dated March
19, 2008 ("Loan Agreement").  The third agreement is the Asset Purchase Agreement dated May
26, 2008 ("APA").  These three agreements (collectively, the "Agreements"), all of which are
incorporated herein by reference, reflected PSC's and Emergent's agreements for Emergent to
acquire substantially all of the assets of PSC and to provide up to $10 million in pre-closing
bridge financing.

9.      In the Agreements, PSC represented that, among other things, it would cooperate
fully with Emergent in the due diligence process, would support the transaction in the proxy
process, would obtain the proxy in favor of the transaction of each of the members of PSC's
Board of Directors ("Board"), and would seek shareholder approval for the sale on or before
June 23, 2008.

10.     Between March and June 2008, Emergent provided PSC with the $10 million in
interim funding based on ongoing representations by PSC that PSC—including both the Board
and Management—remained committed to the asset purchase transaction and would work
diligently to obtain shareholder approval and close the transaction.  Adams himself represented
that he supported the transaction and would work to close the deal.

11.     PSC and Emergent set the closing date of the transaction for June 24, 2008, promptly after the scheduled PSC shareholder meeting.  On June 12, 2008, PSC mailed its proxy statement and noticed its shareholder meeting for June 23, 2008.

12.     In the time leading up to the scheduled shareholder meeting, Adams and Cox undertook a series of steps to undermine and derail the sale of PSC to Emergent.  Among other things, Adams and Cox refused to cooperate in the due diligence process, in violation of the obligations under the Agreements, including by failing to disclose material information to Emergent such as the existence of material contracts, manufacturing challenges that jeopardized near-term FDA approval, and negative feedback regarding the BARDA funding.

13.     Also in furtherance of the fraudulent scheme, Adams and Cox aggressively campaigned against the transaction and manipulated the proxy process to ensure that the transaction with Emergent would not be completed.  This conduct included:

- failing to disclose to PSC's shareholders PSC's true financial condition and its reliance upon Emergent's bridge financing to sustain operations;

- refusing to disclose and misrepresenting to PSC's shareholders critical facts, including information about the development status of FluBlok, PSC's readiness for a U.S. Food and Drug Administration ("FDA") inspection, and the extent and likelihood of BARDA funding;

- manipulating PSC's share ownership records for the purpose of defeating shareholder approval of the transaction;

- disparaging Emergent and the proposed transaction to other members of the life sciences industry, to government representatives, and to PSC's shareholders;

- misleading PSC's shareholders about PSC's ability to continue on a stand-alone basis without Emergent in an effort to garner opposition to the transaction;

- informing PSC's shareholders and contract partners, falsely, in an effort to block the transaction, that the APA precluded them from speaking directly with representatives of Emergent; and

- actively lobbying against the transaction during the proxy process through telephonic, in-person, and written communications with shareholders urging them to vote against the transaction.

14.     As Emergent became aware of certain of Adams's and Cox's misconduct, it brought their actions to the attention of PSC's Board and counsel, but the problems continued. Notwithstanding Adams's and Cox's conduct, and because Emergent had already invested $10 million in PSC and additional time and funds in pursuing the deal and had received repeated reassurances regarding the transaction, Emergent continued to pursue the transaction in accordance with the Agreements.

15.     Shortly before the shareholder meeting scheduled for Monday, June 23, Emergent learned that PSC had failed to comply with Delaware law governing notice to shareholders of asset purchase transactions and notified PSC's Board and counsel of that defect.  In addition to the procedural defect, Adams and Cox had succeeded in generating substantial opposition among shareholders to the closing of the transaction.  On Sunday, June 22, PSC informed Emergent that PSC intended to adjourn the planned shareholder meeting on Monday morning and to inform shareholders that the meeting would be rescheduled in the not-too-distant future.  No new meeting has been scheduled.

16.     After succeeding in preventing the closing of the transaction contemplated by the APA, Adams and Cox continued to carry out their scheme to defraud Emergent.  On the heels of the canceled shareholder meeting, Adams and his representatives began to demand that Emergent increase the loan facility from $10 million to $13 million and continue to pay PSC's payroll and other expenses.  Emergent explained that it would not continue to fund PSC's operations in the absence of a clear path forward to closing the transaction.  PSC took the position that Emergent was required to continue to fund PSC, despite PSC's default on the loan and PSC's refusal to support the transaction.  PSC threatened to take "affirmative action" to "cause significant disruption to [Emergent]" if Emergent did not maintain PSC's viability by continuing to fund operations.  Notwithstanding PSC's insistence on obtaining additional funds, PSC, including Adams and Cox, continued to thwart Emergent's diligence efforts and PSC attempted to terminate the APA to avoid its obligations to sell the company to Emergent and to refrain from soliciting alternative transactions.

17.     The facts that have come to light since the execution of the Agreements make clear that, contrary to his representations to Emergent, Adams never supported the deal to sell PSC's assets to Emergent.  Rather, he and Cox simply intended to get far enough along in the process that Emergent would be willing to provide PSC with $10 million or more in supposed "bridge financing" to keep PSC alive until a closing that Adams and Cox ensured would never take place.  Once PSC had Emergent's money in hand, Adams and Cox implemented an aggressive strategy to undermine and derail the transaction and to find competing strategic transactions that would enable PSC to "take Emergent out."  Rather than sell PSC's assets to Emergent, Adams and Cox sought to take the funds from the bridge loan to keep PSC afloat so they could retain control of the company.

- 6 -

18.     Emergent seeks damages as a result of Adams's and Cox's tortious conduct, including but not limited to the substantial resources that Emergent expended in pursuing the deal with PSC over the course of many months and the expected benefits from the transaction had it proceeded.

## The Parties

19.     Emergent BioSolutions Inc. is a Delaware corporation headquartered in Rockville, Maryland, with a principal place of business in Maryland.  It is a bio- pharmaceutical company that develops and manufactures vaccines and therapeutic products.  It is traded publicly on the New York Stock Exchange.

20.     Defendant Adams is a Director of PSC and serves as the company's President and Chief Executive Officer.  Adams is a Connecticut citizen, and resides at 160 Morgan Avenue, East Haven, Connecticut.

21.     Defendant Cox is the Chief Operating Officer of PSC.  Cox is a Connecticut citizen and resides at 160 Morgan Avenue, East Haven, Connecticut.

## Jurisdiction and Venue

22.     This court has jurisdiction over this matter, which exceeds the sum or value of $75,000 exclusive of interest and costs, pursuant to 28 U.S.C. § 1332(a).

23.     Venue is proper pursuant to 28 U.S.C. § 1391(a), as both defendants reside in this District.

## Factual Allegations

Background

24.     Between 2004 and 2008, PSC's Management implemented a risky "go it alone" business strategy that involved commencing a costly "Phase III" clinical trial program for its influenza vaccine candidate, FluBlok, without sufficient funding in place.  PSC manufactured

multiple lots of the vaccine candidate, conducted clinical studies at multiple sites involving more than 5,000 subjects, retained consultants and other third parties to support their regulatory strategy, upgraded and renovated manufacturing facilities, and designed quality laboratories, all in an effort to become compliant with FDA standards for licensed biologic products.  PSC also prepared and submitted a Biologics License Application ("BLA") with the FDA for marketing approval of FluBlok.

25.     In implementing this strategy, PSC accrued multi-million dollar financial obligations to clinical research organizations, consultants, and others who had supported the FluBlok development program.  In addition, PSC still needed millions of dollars of additional capital to complete upgrades to its manufacturing facilities, to build quality control laboratories, and to improve its quality and manufacturing infrastructure to satisfy the regulatory requirements of the FDA.

26.     In an effort to continue stand-alone operations, PSC sought financial backing from more than 150 venture capitalists and potential strategic partners over a three-year period between 2005 and 2008.  Those efforts failed to yield funds sufficient to enable PSC to continue stand-alone operations.

27.     By early 2008, PSC was facing more than $15 million in liabilities coming due—accruing at a rate of more than $2 million per month—with no financial resources to satisfy those liabilities.

28.     It is against this backdrop that Adams began to market PSC to Emergent in January 2008.  Adams initially proposed a "license" arrangement under which Emergent would pay for PSC's technology, but PSC would remain an independent entity and the owner of its assets.  In response, Emergent made clear that it was not interested in a license transaction but

was willing to pursue an acquisition of PSC's assets.  Adams agreed to sell PSC to Emergent, but advocated a share purchase transaction instead of an asset purchase.  Emergent rejected that structure for a variety of reasons and indicated that it was prepared to move forward solely on the basis of an asset purchase.  Adams represented that he was willing to go forward with the negotiations on that basis.

29.     Because Adams previously had pursued a licensing arrangement for FluBlok, and because Emergent learned that Cox strongly supported a license rather than a sale, Emergent sought assurances that PSC's Board and Management fully supported the transaction.

30.     Emergent received representations from William Narwold, the Chairman of PSC's Board, from Wayne Martino, PSC's outside counsel, and from Adams himself that PSC's Board fully supported the transaction and would vote in favor of the transaction.  With respect to Cox, Emergent was told that she was holding out hope that a licensing deal would come along, but that the Board had come to the realization that that was not going to happen.  Adams indicated that Cox would "come around" to supporting the deal.

31.     Between February and May 2008, during the course of contract negotiations and due diligence, Adams and Cox represented to Emergent that FluBlok had successfully completed Phase III human clinical trials, that PSC was successfully manufacturing FluBlok in its Meriden facility, and that PSC would be submitting its BLA for FluBlok to the FDA in the Spring of 2008.  Adams and Cox further represented that the FDA had agreed to approve FluBlok on an expedited basis and that the FDA had indicated that it would grant marketing approval for FluBlok in or before October 2008, in time to launch the product for the 2008-2009 influenza season.

32.     Adams and Cox also represented to Emergent that PSC had submitted a proposal to BARDA seeking more than $160 million in development funding for FluBlok, that BARDA had given PSC very positive feedback, and that PSC expected BARDA to grant a development funding award for FluBlok in June 2008.  Adams and Cox further represented that BARDA was considering providing retroactive funding and interim funding to support the FluBlok development program.

33.     Based on defendants' representations about PSC's technology, its FluBlok development program, and the positive feedback that PSC had received from both FDA and BARDA, Emergent and PSC negotiated a transaction pursuant to which Emergent would purchase substantially all of PSC's assets, including FluBlok.

34.     From the outset of the discussions, and throughout the negotiation process, Adams and Cox continually represented to Emergent that PSC did not have sufficient operating capital to continue its operations through the anticipated closing date.  Adams therefore requested that Emergent provide a bridge loan to enable PSC to operate until the transaction closed.

35.     Emergent agreed to provide PSC with interim funding (under carefully prescribed conditions and limitations) based on:  PSC's Management's representations about the development status of FluBlok and prospects for BARDA funding; representations about the support of the Board, including Adams, for the sale of PSC to Emergent; and, PSC's representation and agreement that the parties would proceed as rapidly as possible to the closing of the sale transaction.  Emergent repeatedly made clear that it was not interested in a license or any other kind of transaction that did not involve Emergent's acquisition of PSC's assets.

The Letter of Intent

36.     On or about February 5, 2008, PSC and Emergent entered into the LOI, pursuant to which the two companies agreed to negotiate one or more definitive agreements for the purchase by Emergent of substantially all of PSC's assets.  In the LOI, signed by Adams, PSC also represented to Emergent that it would cooperate fully and work diligently to close the final transaction as soon as possible.

37.     Pursuant to a supplement to the LOI, Emergent agreed to provide up to $10 million in pre-closing financing, intended to support PSC's ongoing business operations, which PSC represented would consist primarily of costs associated with the FDA-mandated Phase III studies of FluBlok and preparations for marketing approval for FluBlok.  Pursuant to the supplemented LOI, Part B(4)(b)(i), PSC and Emergent agreed that the bridge loan would be secured by all of the assets of PSC.

38.     The LOI contained a "no-shop" provision, Part B(3)(b), which precluded PSC from soliciting, directly or indirectly, any offers of a "Competitive Transaction," including any merger or sale of the company, any license of its intellectual property, or any solicitation of opposition from the shareholders, while the parties were negotiating definitive agreements for the asset purchase.

39.     This "no-shop" provision was particularly important to Emergent in light of its agreement to provide PSC with up to $10 million to fund PSC's operations prior to closing. Emergent's business model centers around acquiring new technologies; it is not in the business of investing in outside ventures.  Emergent would not have provided any interim funding to PSC absent the agreement for its acquisition.  The "no-shop" provision was necessary to prevent Adams, Cox, and PSC from simply using the funds for PSC's own advantage and then seeking a

deal elsewhere, which is precisely what they have attempted—and continue to attempt to do now.

40.     As a condition to Emergent's agreement to provide pre-closing financing, and as part of the necessary due diligence associated with the asset purchase, PSC agreed in the LOI, Part B(1), that Emergent would have "full access to all business, product and scientific information, financial books and records, and all other documents and information relevant to the Proposed Transaction."

The Pre-Closing Financing

41.     Promptly after the LOI was signed, and before PSC had provided any access to information as required under the LOI, Adams and Cox began to demand interim financing from Emergent, saying that cash was needed to cover accounts payable.

42.     Emergent's representatives explained that the loan-related diligence anticipated by the LOI would need to be conducted prior to any interim funding and that Emergent was prepared to begin diligence immediately.

43.     In perpetuation of their fraudulent scheme, Adams and Cox urged Emergent to limit its diligence activities solely to the interim funding and not to conduct any diligence around the asset purchase itself.  Adams and Cox misled Emergent into believing that it was necessary to postpone all diligence related to PSC's operations, products, and technology because of PSC's limited personnel and resources.  To further support the fraudulent plan, Adams told Emergent that if Emergent was going to be acquiring PSC's operations, Emergent needed to trust that PSC knew what it was doing.

44.     In an effort to complete diligence quickly enough to provide PSC with the interim funding that Adams and Cox were demanding, Emergent agreed to stage its diligence requests so that the initial diligence would relate directly to the bridge loan and collateral.

45.     On February 8, 2008, a few days after the LOI was executed, Emergent sent PSC a due diligence request seeking information relating specifically to the pre-closing financing. Emergent focused its loan-related diligence requests on the status and value of collateral, including real estate, equipment, intellectual property, and accounts receivable.

46.     On the same day that Emergent was trying to begin diligence on the loan collateral, Adams, in furtherance of the fraudulent scheme, tried to persuade Emergent to abandon the LOI requirement that the bridge financing be fully secured.  For example, in a February 8, 2008 e-mail to an Emergent representative, Adams stated: "I cannot understand why a senior note - senior to everything - coupled with a negative pledge is not adequate security even if you loan $10 million (or more).  That will show faith and trust in us as people."

47.     Emergent resisted Adams's attempt to renege on the LOI, which specifically stated that the bridge loan would be secured by all of PSC's assets, and advised Adams that interim funding was contingent on the diligence required by the LOI.  Emergent reiterated that it was well-positioned to complete diligence quickly, but PSC's Management dragged their feet.

48.     Throughout the month of February, Emergent repeatedly reached out to PSC, including Management, to discuss diligence logistics, to request meetings with PSC's Management and/or their designees, and to determine how best to move forward.  Despite their demands for cash, Adams and Cox resisted cooperating in the diligence process.

49.     PSC's Management finally agreed to meet with Emergent in person on February 27, 2008 at PSC's offices in Meriden, Connecticut.  Emergent was not permitted to meet with

any PSC employees outside of the presence of PSC's Management and, in particular, Cox.  And, in what became an integral part of their scheme to defraud Emergent, PSC's Management represented that Cox was too busy to devote time to diligence and that many of the documents requested by Emergent were "confidential" or "highly sensitive."

50.     PSC did provide Emergent with some information during that meeting.  With respect to its tangible assets, PSC represented that:  (1) its facility and real estate were valued at over $5 million; (2) that it had a lease with an option to purchase additional property across the street for expansion; and, (3) its anticipated revenues for 2008 were between $6 million and $8 million based upon confidential contracts for its "GeneXpress" service.

51.     Although PSC, including Adams, initially had led Emergent to believe that the land on which PSC's facility was located was owned by PSC, during diligence Emergent discovered that the land and facility were leased and not owned and that there was a senior mortgage on the leasehold interest.  Emergent also learned that there was, in fact, no lease on the so-called expansion space, despite the fact that PSC already had begun to undertake construction and to move employees into the space.  When confronted with this discovery, Adams represented that he had an agreement in principle but that the documentation was not yet finalized.  With respect to revenues, Adams and Cox refused to share with Emergent the contracts under which the claimed revenues were generated, arguing that they were too confidential, but Adams and Cox shared internal financial records supporting the stated revenues.

52.     Based on PSC's Management's representation that PSC was in "urgent" need of money to sustain operations, Emergent prepared the necessary loan documents on an expedited basis.  Emergent did so notwithstanding the due diligence challenges, based on PSC's Management's representations that PSC was not as organized as it would like to be, because all

resources were being devoted to the FluBlok approval, that FluBlok was on the verge of FDA approval and BARDA funding, that PSC would devote more resources to diligence once it received funds to keep it afloat, and that PSC was prepared to move forward quickly to close the asset purchase.

53.     On March 19, 2008, Emergent and PSC entered into the Loan Agreement, signed by Adams, pursuant to which Emergent agreed to provide PSC with up to $10 million to fund its operations through the closing of the asset purchase.  Pursuant to Section 5(m) of the Loan Agreement, PSC agreed to "refrain from making any borrowings, incurring any debt (other than trade payables in the ordinary course of business not exceeding $100,000, this Loan and obligations in connection with the Upgrade)," and from "issuing any securities that constitute more than twenty (20%) of the voting securities of the Borrower on a fully diluted as converted basis…."  Pursuant to Section 5(k) of the Loan Agreement, PSC agreed to permit representatives of Emergent "to visit and inspect any of its properties, to examine its corporate, financial and operating books and records (and make copies thereof or abstracts therefrom) and to discuss its affairs, finances and accounts with its officers, directors or accountants at any time during normal business hours with reasonable notice."

54.     Emergent provided PSC with $3.5 million immediately after signing the Loan Agreement and another $6.5 million over the next few months.  As of the date of PSC's planned shareholder meeting on June 23, 2008 to obtain approval of the asset purchase transaction, Emergent had provided PSC with the full $10 million under the Loan Agreement.

The Asset Purchase Agreement

55.     Prior to receiving the initial tranche of interim funding from Emergent, Adams and Cox repeatedly assured Emergent that they would cooperate fully with diligence efforts once

"the money was in the bank."  In fact, on March 2, 2008, Cox wrote an e-mail to Emergent claiming that she was "unable to devote any time to this project unless and until we have received funds .... I have learned my lesson by spending too much time in too many useless [due diligence] meetings set up by ignorant bankers .... The saying money talks ... is very appropriate to get my attention.  The moment we have received funds I would be happy to arrange meetings and set schedules."

56.     After PSC received the first $3.5 million in bridge financing, however, Adams and Cox continued to stonewall Emergent on diligence and to otherwise continue to frustrate Emergent's efforts to move forward with the asset purchase.  Even when purporting to agree to provide information to Emergent or to facilitate meetings, Adams and Cox remained slow-moving and reluctant to provide copies of employment-related documents, revenue-generating contracts, collaboration agreements, PSC's stock ledger, communications with BARDA or FDA, and other key documents necessary to the completion and closing of the transaction.  The promised cooperation and meetings did not occur.  Even when Emergent's counsel was given permission to conduct diligence at PSC's offices in Connecticut, she was not permitted to interview any PSC employees or to make copies of material PSC documents.

57.     In April 2008, in the midst of negotiating the asset purchase, Emergent learned that PSC had received a $1 million wire transfer into the corporate bank account.  Because PSC had agreed in the LOI not to seek out competitive transactions or to undertake new liabilities without Emergent's knowledge while finalizing the asset purchase, Emergent inquired as to the source of funds.  At a meeting in New Haven, Connecticut on April 22, 2008, Adams represented to Emergent that, in light of PSC's urgent needs for funds, he had used money from his children's trust fund to keep PSC's operations going.

58.     Emergent subsequently learned that the wire transfer record indicated that the funds were from "GSK," which Emergent understood to mean "GlaxoSmithKline."  Emergent inquired further about the situation and was told that Adams had "done something he should not have done," but that PSC would not seek to transfer this liability to Emergent as part of the acquisition.  Emergent understood this to mean that Adams had engaged in negotiations with GSK regarding a competitive transaction in violation of the "no-shop" provision of the LOI.  PSC represented that there was no written record relating to the transaction with GSK, other than the wire transfer record.

59.     Adams and Cox continued, contrary to their representations to Emergent and obligations as PSC Management under the LOI and Loan Agreement, to thwart Emergent's diligence efforts and the acquisition more generally.  Adams and Cox refused to provide Emergent with access to a "virtual data room" that PSC had temporarily and very briefly made available to Emergent.  PSC indicated that it took the system down periodically to "update" it, then it claimed that it had to generate new passcodes to permit access.  Finally, via an email from PSC counsel Martino on June 11, 2008, PSC claimed that it had been "shuttered," because it contained confidential information.  Access was never restored.

60.     In the days immediately preceding the execution of the APA, previously undisclosed material liabilities of PSC cropped up, including employment-related agreements, intellectual property licenses, and a purported manufacturing agreement with a major shareholder for which PSC manufactures clinical supplies of an experimental drug.  Adams and Cox again attributed the withholding of these documents during the prior three months to the strains on PSC's resources.  In order to prevent Emergent from interpreting these various events and difficulties as warning signs, representatives of PSC, including Adams and Cox, represented to

Emergent that PSC was just resource constrained and very busy preparing for its BLA

submission and FDA inspection, but that all of the problems would be cleared up promptly.

61.    During the week of May 19, 2008, shortly before the APA was executed,

Emergent began to suspect that, contrary to prior representations, Adams was not, in fact, fully

committed to the transaction.  In the late stages of the contract negotiations, PSC's Board

Chairman Narwold indicated that Adams wanted to remove from the contract any requirement

that Adams vote his shares in favor of the transaction by proxy.  He indicated that he wanted to

vote them in person at the shareholder meeting.  In addition, Adams refused to include in the

press release announcing the transaction a quote suggesting that Adams fully supported the

transaction.  PSC continued to assure Emergent that Adams would support the transaction.

62.    On May 26, 2008, Emergent and PSC executed the APA, pursuant to which they

agreed to work diligently to close the transaction on or before June 30, 2008.   Among other

things, the APA included a "no-shop" provision, § 7.10, wherein PSC agreed it would not solicit,

directly or indirectly, any proposals concerning any "Competitive Transactions," which were

defined to include any merger or sale of the company, or any license of its intellectual property,

or any solicitation of shareholders in opposition to the approval of the APA.

63.    After the APA was executed, Emergent learned that Adams refused to vote in

favor of the APA when it was presented to the PSC Board for approval, refused to sign the APA,

and refused to vote his shares in favor of the transaction—although he had previously supported

and signed the LOI and the Loan Agreement.  In hindsight, it is clear that Adams had entirely

misrepresented his support for the transaction and that Adams refused to vote in favor of or sign

the APA because he had never been in favor of the deal and never intended for PSC to

consummate the transaction.  Rather, Adams's sole objective appears to have been to secure,

through the LOI and the Loan Agreement, access to $10 million in critically needed financing so that PSC could continue operations as an independent entity.

64.     After the APA was executed, Adams and Cox continued to take actions in furtherance of their fraudulent scheme.  Adams and Cox flatly refused to cooperate with Emergent on diligence, transition preparations, or human resources matters and instructed all PSC employees not to communicate with any representative of Emergent.  For example, on May 28, 2008, Cox sent an email to Emergent's Vice President of Human Resources informing her that she needed to "get permission" from either Adams or Cox before contacting any PSC employees, as "[w]e need to know what you are planning to discuss."  Cox also emailed Emergent's Vice President of Human Resources on May 31, 2008, stating that "there is still a lot of going back and forth outside my knowledge.  Just to let you know: I do not appreciate that."

65.     Because Emergent intended to hire all of PSC's existing employees—and the anticipated closing was only one month away—Emergent requested an on-site meeting during which two Emergent senior executives planned to give a company overview to all PSC employees and Emergent's human resources ("HR") representatives planned to provide PSC's employees with background materials and pre-employment packages to ensure continuous employment and benefits.  PSC's Management initially refused to permit this meeting. Ultimately (and reluctantly), PSC's Management agreed to let Emergent's representatives come to Meriden, Connecticut to provide an overview of Emergent.  The morning of the meeting, however, Cox attempted to cancel the meeting.  First, Cox emailed Emergent's President and Chief Operating Officer, Daniel Abdun-Nabi, and others at Emergent at 3:03 a.m. on May 29, 2008, to tell him to cancel his visit of that day, as she could "not support a presentation by you to our people" under circumstances where she was disappointed in the timing of Emergent

providing interim funding.  Cox then sent another email at 6:31 a.m. on that same day saying that "given the unfortunate circumstances," she needed to postpone the meeting.  She finally emailed Mr. Abdun-Nabi's executive assistant at 6:32 a.m. on the same day to tell her "the visit today is canceled."

66.     Ultimately, both the senior management presentation and the HR meeting occurred.  But the meetings, intended to facilitate the transition, did not accomplish their goal; on Monday, June 2, 2008, Cox emailed Emergent's Senior Vice President and CFO, Don Elsey, and informed him that she did not want any PSC employees to "sign anything" before shareholder approval was obtained.  All employees were instructed not to return forms to Emergent.

67.     In addition, Adams and Cox refused to allow Emergent to review or participate in any way in the planning for an FDA pre-approval inspection ("PAI") for FluBlok that was scheduled to take place on July 7—just one week *after* the scheduled closing of the Emergent transaction.  For example, Robert Kramer, the Emergent executive responsible for the transition, asked Adams on June 4, 2008, to allow him to spend time with PSC's executive in charge of the PAI, Jaap Koster, while Kramer was in Meriden that day.  Kramer was informed that Adams had sent Koster home because he was purportedly sick, despite the fact that Koster had been in a meeting with Adams that morning.  Because the PAI inspection would have occurred under Emergent's ownership if the transaction had closed as scheduled, Adams's refusal to involve Emergent in the process was not only improper under the parties' agreements, but also demonstrates that Adams never intended to complete the deal with Emergent.

68.     Emergent continued to request the involvement of PSC's counsel and PSC's Board to help facilitate the diligence and closing preparation process.  All to no avail.  Adams and Cox continued to keep Emergent in the dark about the BLA, the preparations for the PAI, the

BARDA award, a government audit of PSC's financial condition and FluBlok budget, and other critical matters.

69.     Adams's and Cox's conduct demonstrates the falsity of the representations they made to Emergent to induce it to pursue a deal with PSC and loan PSC $10 million so the company could stay afloat.

The Proxy Process

70.     Pursuant to the terms of the APA, §7.9(a)(i), PSC was obligated to hold a shareholder meeting on or before June 23, 2008 to obtain shareholder approval of the transaction. An organized and orderly proxy process run in accordance with all applicable laws was necessary to obtaining the shareholder approval needed for the completion of the transaction.

71.     On June 8, 2008, PSC's counsel provided to counsel for Emergent a draft of the proxy statement that PSC represented was being sent to shareholders with the intention of obtaining approval of the transaction.  Adams and Cox were heavily involved in the drafting of the proxy statement.

72.     Emergent's counsel provided comments on the draft, including four principal concerns with the nature of the disclosures that would inappropriately sway shareholder sentiment to oppose the transaction with Emergent:  (1) that the potential for PSC to obtain funding from BARDA in June 2008 was overstated; (2) that the likelihood of PSC's obtaining marketing approval for FluBlok in the Fall of 2008 was overstated; (3) that the proxy failed to accurately reflect PSC's dire financial condition and the probability of bankruptcy if the transaction were not to close; and, (4) that the proxy improperly bundled the vote on the transaction (which required a simple majority) and the vote on certain amendments to the Certificate of Incorporation affecting the rights of preferred shareholders (which required a

supermajority of two of PSC's classes of preferred stock and the affirmative vote of the sole shareholder to the third class of preferred stock), in effect setting the transaction up for failure unless the required vote of all three classes of preferred stock was obtained.

73.     Prior to the proxy mailing, Emergent also recommended that PSC retain a proxy solicitation service to handle shareholder outreach and voting, in light of the fact that PSC has over 400 shareholders who are spread out across the world.  In furtherance of its efforts to undermine the transaction, PSC refused to hire a proxy service or to develop a methodical shareholder outreach plan.  Board Chairman Narwold affirmatively sought to allay Emergent's concerns by stating that that they "knew their shareholders" and that they, including Adams, would personally reach out to PSC's shareholders to obtain their support for the transaction with Emergent.

74.     On June 12, 2008, PSC mailed to its shareholders a notice setting the shareholder meeting for June 23, 2008, and the proxy describing the proposed transaction and share restructuring.

75.     Shortly after the proxy mailing, Emergent began to receive communications from third parties indicating that Adams and Cox were disparaging both Emergent and the transaction at industry conferences, in private communications with third parties, to PSC's shareholders, and in other settings.  For example, on June 18, 2008, a representative of Emergent met with a representative of another biotechnology company who stated that he had had dinner with Adams on June 17, 2008, and that Adams had been "less than complimentary" toward Emergent.  On June 20, 2008, representatives of Emergent learned from another company that PSC's Management had been "bad mouthing" Emergent at the biotechnology industry conference.

76.     Emergent also learned that, in furtherance of their plan to undermine the transaction, both Adams and Cox made personal phone calls and/or visits to shareholders to urge them to vote against the transaction.

77.     In furtherance of her efforts to derail the transaction, Cox openly denigrated PSC's Board, challenged the valuation opinion of PSC's own investment bank, and sent written communications to shareholders urging them to vote against the transaction.

78.     During the week of June 16, Emergent learned that many shareholders had not yet submitted their proxies, including several major shareholders.  Emergent again recommended to PSC that the company hire a proxy service to get the vote out.  PSC again refused, but indicated that it would not object if Emergent retained a proxy solicitation service.  Emergent thereafter hired a proxy service, but it was too late in the process for this to make any meaningful difference.

79.     Emergent also contacted PSC numerous times that week to urge PSC's counsel and Board to be proactive in reaching out to shareholders, particularly in light of the destructive conduct of Adams and Cox, about which Emergent was then beginning to learn.  The Chairman of PSC's Board and its counsel suggested that Emergent itself could reach out to PSC's shareholders in an effort to obtain shareholder support for the transaction.  PSC failed to disclose, however, that Adams and Cox already had gotten to most of PSC's major shareholders, and had falsely informed them that it would be a violation of the APA for shareholders to speak with representatives of Emergent.  Thus, Emergent was deprived of the opportunity to have meaningful communications with key PSC shareholders.

80.     PSC's Management also took extreme measures with PSC employees to ensure that they would not vote in favor of the transaction.  Cox openly told employees that the deal was

terrible for PSC, its shareholders, and its employees and that she would vote against the transaction. Adams told PSC's employees that he was against the transaction and insisted that each employee turn his or her proxy over to him personally or provide him with a copy of his or her proxy. Employees were intimidated by PSC's Management and therefore were reluctant to vote in favor of the transaction.

81.     Emergent continued to notify PSC of the blatant violations of the APA by PSC's Management and demanded that PSC cease this conduct. Emergent repeatedly reminded PSC of the contractual obligation of PSC's Management, Board, and counsel to be proactive in seeking support of the transaction in the solicitation process. PSC took no effective action to stop or inhibit the wrongful conduct of its Management.

82.     In addition, during the week of June 16, Emergent learned that PSC had failed to comply with Delaware law regarding the notice required for the shareholder meeting. Emergent promptly informed PSC of the flaw in the proxy process.

83.     In the weeks leading up to the shareholder meeting, PSC's Management had built up enough shareholder opposition to jeopardize the transaction, including the negative vote of the sole shareholder of the third class of PSC's preferred stock, whose vote was critical for approval of the transaction as presented by PSC in the proxy. On June 22, the day before the meeting, PSC's Board Chairman notified Emergent that he intended to postpone the meeting but would reschedule it in the "not too distant future."

84.     As of the time of the filing of this Complaint, no new meeting date had been set.

The Loan Default

85.     In parallel to Adams's and Cox's efforts to thwart the deal, PSC demanded that Emergent provide PSC with $2 million in funding in June (Emergent already had provided $8

million by that time) and, consistent with the parties' agreement, provided Emergent with a description of each of the accounts to be paid.

86.    On June 16, 2008, Emergent wired to PSC $2 million based on the approved check-run process set forth in the APA.   Adams, however, decided not to pay the approved accounts.  Instead—apparently convinced the asset purchase transaction was falling apart thanks in part to his efforts, and recognizing that Emergent would soon discover the truth and cease funding their operations—Adams instructed PSC's accounts payable manager to pay only selected approved vendors, not to make payments to certain vendors that Emergent had approved, and to pay vendors that were not on the approved list.  Adams also set aside $250,000 to cover his "deferred compensation" and retained funds for other undisclosed future expenditures.

87.    On June 18, 2008, Emergent notified PSC of this conduct and demanded that PSC either return the remaining funds (estimated to be in excess of $500,000 as of that date) or apply them to the payment of each of the approved accounts.  PSC refused to do either.

88.    On June 20, 2008, Emergent sent PSC a notice of default under the Loan Agreement.  Pending discussions between Emergent and PSC of a possible path forward to consummate the transaction, Emergent extended the three-day cure period under the Loan Agreement until 12 p.m. on Wednesday, July 9, 2008.  PSC failed to cure the default within the cure period, which has now expired.  Consequently, an "Event of Default" has occurred under the Loan Agreement entitling Emergent, among other things, to accelerated repayment of the loan and to foreclose on the collateral.

Subsequent Events

89.    On June 24, 2008, Emergent's Chief Executive Officer had dinner with Adams in New York City to determine whether PSC's Management was against the transaction, whether its opposition to the transaction was based on Management's own pecuniary interest, and how the deal could be salvaged.  Emergent's Chief Executive Officer explained to Adams that he wanted to understand what it would take to get Adams, Cox, and PSC's other major shareholders to support the transaction.

90.    Adams admitted that he and Cox were against the asset purchase transaction and that he thought PSC could now renegotiate the structure and terms of the proposed transaction. He again proposed the licensing transaction that Emergent had firmly rejected before entering into the LOI.

91.    Emergent indicated that it was not prepared to renegotiate the entire transaction as a licensing deal.

92.    Following this meeting, Adams told third parties that he was "thrilled" that the asset purchase would not close.  Cox also continued her attempts at stonewalling and obstructing, emailing Kramer on June 24, 2008, to inform him that Emergent's due diligence efforts were "a HUGE distraction."

93.    Notwithstanding the failed proxy process, PSC's blatant disregard for its contractual obligations to Emergent, and PSC's default of the Loan Agreement, immediately on the heels of the cancelled shareholder meeting, Adams and other representatives of PSC began to demand that Emergent provide additional financing over and above the $10 million already provided to sustain PSC's operations.

94.     Emergent informed PSC that no further interim funding would be provided, absent a clear path forward to closing the transaction.  In light of PSC's conduct, the Board's inability to control the conduct of PSC's Management, and the obvious conclusion that Cox and Adams had not supported the transaction, Emergent simply could not continue to fund PSC's operations with no defined path to closure of an acquisition.

95.     PSC informed Emergent that it would have to enhance the purchase price and substantially restructure the transaction as a cash merger if it wanted to have any chance of obtaining shareholder approval for the transaction.  Even with these changes, PSC informed Emergent that it could not guarantee shareholder approval, nor could it prevent the opposition of PSC's Management to the transaction.

96.     PSC continued to demand funding, however, and threatened to take "affirmative action" against Emergent if Emergent did not commit to further interim funding.

97.     In early July, Emergent filed a lawsuit in New York state court ("the New York action") against PSC, Adams and Cox, alleging breach of contract and fraud, among other claims.  Adams and Cox moved to dismiss for lack of personal jurisdiction and Emergent subsequently stipulated to the dismissal of Adams and Cox from the New York action.

98.     On July 21, 2008, Board Chairman Narwold, sent a letter to Emergent's President, in which PSC purported to terminate the APA.  Narwold claimed that PSC was entitled to terminate the APA because Emergent had refused to provide additional interim funding to PSC after the canceled shareholder meeting and had disclosed unidentified "confidential" information in connection with the New York action.  In that letter, Narwold acknowledged that PSC could not currently pay its "Trade Payables."

99.     On July 23, 2008, Emergent's General Counsel, Denise Esposito, wrote to Narwold, contesting PSC's position that it was entitled to terminate the APA, demanding immediate repayment of the loan, and demanding immediate access to information about PSC's finances to which Emergent was entitled pursuant to § 5(k) of the Loan Agreement.

100.    On July 25, 2008, PSC's outside-counsel, Martino, responded to Esposito's July 23, 2008 letter.  Martino declined to provide any additional information about PSC's finances and stated that PSC believed it was no longer bound to the terms of the APA and was free to pursue debt or equity financing from third-parties.  In this letter, despite Emergent's request, Martino did not identify any confidential information that Emergent allegedly disclosed improperly.

101.    On July 30, 3008, Esposito wrote to Martino and specifically requested that PSC identify any confidential information that it alleges Emergent disclosed.  To date, PSC has not identified any such information.

102.    On August 6, 2008, Adams wrote to PSC's shareholders, informing them that the company had "terminated the Asset Purchase Agreement ("APA") with Emergent BioSolutions because of multiple breaches of the APA."  Adams also told PSC's shareholders that Emergent had "sought, largely without success, to damage relationships with our customers, including very special relationships that we have spent years cultivating in Japan" – a completely baseless allegation.

## COUNT I – FRAUD

103.    Emergent incorporates the allegations in paragraphs 1 through 103 as if fully set forth herein.

104.    Adams and Cox, seeking to keep PSC afloat and under their control, defrauded Emergent.  They fraudulently induced Emergent to pursue a deal with PSC and fraudulently induced Emergent to provide PSC $10 million in "bridge financing" through the conduct detailed above, including by:

(a)    falsely representing, among other things: (1) the state of PSC's assets and business operations; (2) that Adams actively supported the transaction, was prepared to and intended to sell substantially all of PSC's assets to Emergent, and would seek approval by PSC's shareholders; (3) that the sale transaction would be promptly approved and completed; and (4) that Adams and Cox would cooperate with Emergent's diligence efforts.

(b)    intentionally and fraudulently failing to disclose to Emergent that Adams never had any intention to go through with the sale of PSC to Emergent; and

(c)    intentionally and falsely leading Emergent to believe that the transaction would occur so that Emergent would advance PSC $10 million in urgently needed working capital to sustain PSC while Adams and Cox searched for alternate funding that would enable it to abandon the Emergent transaction.

105.    Adams's and Cox's misrepresentations and omissions were material.  Adams and Cox knew that Emergent would not have provided working capital to PSC—let alone $10 million—in the context of a stand-alone loan, a licensing arrangement, or any transaction other than a sale of PSC's business to Emergent.

106.    Emergent relied on the material misrepresentations and omissions of Adams and Cox by, among other things:  (1) executing a loan facility to provide bridge funding; (2) advancing $10 million to PSC under that loan facility; (3) proceeding with the deal contemplated

- 29 -

by the LOI and APA by, among other things, devoting extensive resources to the closing of the transaction and incurring costs in connection therewith; and, (4) deploying substantial resources to developing transition and business plans for assuming the operations of PSC and incurring costs in connection therewith.

107.     As a result of Adams's and Cox's material misrepresentations and omissions, Emergent has suffered damages in an amount to be determined at trial.

## COUNT II - UNFAIR TRADE PRACTICES

108.     Emergent incorporates the allegations in paragraphs 1 through 105 as if fully set forth herein.

109.     The above-described acts and omissions of Adams and Cox violate applicable state unfair trade practice law, including Conn. Gen. Stat. § 42-110b(a) (the Connecticut Unfair Trade Practices Act), in that they are unfair, deceptive, immoral, unethical and/or unscrupulous and have caused and continue to cause substantial injury to plaintiff.

110.     The acts and omissions of Adams and Cox caused Emergent to suffer ascertainable loss, in that they deprived Emergent of the benefit of the bargain for which it entered into the Agreements, and caused Emergent to incur substantial expenses in terms of time and resources committed to the contemplated asset transaction, which Emergent would not have otherwise incurred absent the acts and omissions of Adams and Cox.

111.     As a result of the acts and omissions of Adams and Cox, Emergent is entitled to actual and punitive damages, costs and attorneys' fees, in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff Emergent BioSolutions Inc. respectfully requests that the Court

grant the following relief:

a.   money damages in an amount to be determined at trial, and substantially more than $75,000;

b.   punitive damages in an amount to be determined at trial;

c.   attorneys' fees; and

d.   such additional relief as is just and proper.


Dated:  Bridgeport, CT
        October 3, 2008

                              Respectfully submitted,

                              By:_____

                              *Attorneys for Plaintiff Emergent BioSolutions Inc.*

                              Jonathan B. Orleans # CT05440
                              Pullman & Comley, LLC
                              850 Main Street, P.O. Box 7006
                              Bridgeport, CT  06601-7006

                              *OF COUNSEL*
                              Howard M. Shapiro
                              Anne K. Small
                              Sanket J. Bulsara
                              Charu A. Chandrasekhar
                              Amy B. Cyphert
                              Wilmer Cutler Pickering Hale and Dorr LLP
                              399 Park Avenue
                              New York, NY 10022