IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| EMERGENT BIOSOLUTIONS INC.,<br><br>      Plaintiff,<br><br>-against-<br><br>DANIEL D. ADAMS, AND<br>MANON M.J. COX,<br><br>      Defendants. | Civil Action No. 3:08-cv-1529 (VLB) |

**DECLARATION OF DANIEL J. ABDUN-NABI**

I, DANIEL J. ABDUN-NABI, hereby declare as follows:

1.  I am the President and Chief Operating Officer of Emergent BioSolutions Inc. ("Emergent"), the Plaintiff in the above-captioned action. I submit this Declaration in support of Emergent's opposition to the motion for summary judgment filed by Defendants Daniel D. Adams and Manon M.J. Cox in this action.

<u>Background</u>

2.  I have served as the President of Emergent since April 2007 and as its Chief Operating Officer since May 2007. I previously served as Emergent's Secretary from December 2004 to January 2008; its Senior Vice President of Corporate Affairs and General Counsel from December 2004 to April 2007; and its Vice President of Legal Affairs and General Counsel from May 2004 to December 2004.

3.      Emergent is a biopharmaceutical company focused on the development, manufacture, and commercialization of vaccines and immune-related therapeutics that assist the body's immune system to prevent or treat disease.  A major component of Emergent's growth strategy is the acquisition of development-stage vaccine candidates that require further scientific testing, development and clinical trials prior to launch.

**Defendants Represent That They Will Support And Cooperate With An Asset Purchase Transaction Of Protein Sciences Corporation By Emergent**

4.      In January 2008, I attended the J.P. Morgan Annual Healthcare Conference (the "J.P. Morgan conference") in San Francisco, along with Fuad El-Hibri, Emergent's Chairman of the Board and Chief Executive Officer, and other members of our management team.

5.       Daniel D. Adams, who was then President and Chief Executive Officer of Protein Sciences Corporation ("PSC"), also attended the J.P. Morgan conference and met with me and my Emergent colleagues there to discuss a potential deal between our two companies.  He explained that PSC had been looking for strategic partners or funding sources for an extended period of time and that they had been unsuccessful in securing either.  He stressed the importance of completing a transaction quickly.   He stated that speed in completing a transaction was critically important because PSC's ability to continue operations was at risk, in part because it lacked the funds to pay for clinical trials of its main vaccine product in development, FluBlok.

6.      In our discussions at the J.P. Morgan conference, Mr. Adams initially proposed a licensing deal between PSC and Emergent, but I and others at

- 2 -

Emergent repeatedly told Mr. Adams that we would not be interested in a license transaction.  I told Mr. Adams that Emergent might be interested in pursuing an acquisition of PSC, and that the typical way in which Emergent pursues an acquisition is through an asset purchase.  Mr. Adams told me that he would be open to an acquisition.

7. Negotiations between PSC and Emergent continued over the few weeks following the J.P. Morgan conference.  During these negotiations, I and others at Emergent informed Mr. Adams that the deal on the table was an asset purchase transaction, which was the structure that Emergent strongly favored.

8. During these negotiations, Mr. Adams also said that PSC would require a $10 million bridge loan in order to enable PSC to fund its operations through closing of the transaction.  I understood that continued operations were critical to protecting the value of FluBlok, which was in the midst of the development and approval process.

9. Emergent and PSC, mainly Mr. Adams, moved forward with discussions over a Letter of Intent ("LOI") outlining the terms of a potential transaction between the two companies.  The LOI stated that "we have structured this proposal as an asset purchase," and the accompanying non-binding term sheet was structured for an asset purchase.  The LOI also provided for a $10 million bridge loan from Emergent to fund PSC until the deal could close.

10. Immediately prior to finalizing the LOI, Mr. Adams asked Emergent to revise the LOI to provide that Emergent would consider a stock purchase deal, subject to due diligence, as an alternative to the asset purchase structure that

was the focus of the LOI. Mr. Adams represented that he needed this statement to be added to the LOI "for optics" purposes to gain internal PSC support for the deal, but he provided assurances that he understood that the transaction would be structured as an asset purchase and that all of the terms in the LOI related to an asset purchase, and that he was committed to moving forward promptly with this transaction. Mr. Adams's statements provided the needed assurances of his commitment to the asset purchase structure, and Emergent accommodated his request to amend the language. Even with this change, the focus of the LOI remained an asset purchase and an asset purchase was the only transaction discussed in any detail. On February 5, 2008, Mr. Adams and I signed the LOI on behalf of PSC and Emergent respectively. The LOI was largely non-binding.

11.     Following the LOI, the negotiations between Emergent and PSC turned toward the loan addressed in the LOI and intended to fund PSC's operations until the asset purchase transaction closed.

### I Relied On Defendants' Representations Of Support And Cooperation In Recommending The Bridge Loan To Emergent's Board Of Directors And Entering Into The Loan Agreement

12.     Mr. Adams's and Dr. Cox's requests for bridge financing were an important issue for Emergent. Emergent had never before made such a loan to another company, in the context of an acquisition or more generally. I understood, however, from Mr. Adams, that the loan was an essential part of the deal because funds were needed to keep PSC operational.

13.     By the time of the negotiations over the Loan and Security Agreement ("Loan Agreement") that would provide the requested bridge

financing, I had received various assurances from Defendants concerning the asset purchase transaction that made me willing to proceed with a loan as part of the asset purchase deal.  Mr. Adams had assured me that he supported an asset purchase transaction with Emergent, would cooperate with diligence for the deal, and that he expected the deal to close.  In a telephone conversation with Dr. Manon M. J. Cox, who was then PSC's Chief Operating Officer, she told me that she was very busy and had limited resources, but would provide the diligence for and would cooperate with the deal once PSC received funding from Emergent.

14.     I was willing to proceed with the loan as part of the transaction with PSC based on Mr. Adams's representations to me that he supported Emergent's planned asset purchase transaction with PSC and would cooperate with Emergent to close such a deal and Dr. Cox's representations that she would cooperate with the deal and diligence once PSC obtained the much-needed funding.  Mr. Adams's support and cooperation and Dr. Cox's cooperation with the deal and diligence were critical because Emergent would not take the risk of loaning $10 million to a company to facilitate an acquisition if the CEO and COO were not either committed to the deal or willing to cooperate with the transaction.

15.     Based on Mr. Adams's representation that he supported the asset purchase transaction and would cooperate with the deal and diligence and Dr. Cox's representation that she would cooperate with the deal and diligence once PSC obtained funding from Emergent, I and others on the Emergent management team decided to recommend the $10 million bridge loan in contemplation of the asset purchase transaction to Emergent's Board of Directors.

16. In early March 2008, Emergent's management team made a presentation to Emergent's Board of Directors regarding our recommendation. The Board of Directors was advised that Mr. Adams stressed that PSC needed a $10 million bridge loan to enable it to survive through the closing of the asset purchase transaction by Emergent and that he expected and was committed to completing the asset purchase transaction. Based on management's recommendations, the Board of Directors unanimously voted to approve the loan to PSC as part of the transaction to acquire PSC through an asset acquisition.

17. On March 19, 2008, I met with certain representatives of PSC at PSC's headquarters in Meriden, CT. Dr. Cox reiterated her promise that as soon as Emergent provided loan funds to PSC, she would cooperate with the deal and be able to assist with due diligence for the acquisition.

18. That same day, Mr. Adams signed the Loan Agreement on behalf of PSC and I signed on behalf of Emergent. The Loan Agreement between PSC and Emergent states in Recital A that the LOI "relates to a proposed acquisition by [Emergent] of all or substantially all of the assets of [PSC]" and to "the provision of a loan . . . not to exceed Ten Million Dollars . . . ." The Loan Agreement also refers to this asset acquisition as "the Acquisition" and provides that the loan will be forgiven by Emergent when the Acquisition closes.

19. In proceeding with the Loan Agreement, I (and Emergent in turn) relied on the expressions of support and cooperation that Mr. Adams and Dr. Cox had made. I never would have supported a loan to PSC without Mr. Adams's statements that he supported and would cooperate with Emergent on the asset

purchase transaction, as confirmed by his signing of the Loan Agreement, or without Dr. Cox's promise that once PSC received funding she would provide diligence assistance and cooperate with the deal. Mr. Adams and Dr. Cox together ran and managed PSC, and absent these representations the bridge loan would not have been made because it would have been too risky.

20. After executing the Loan Agreement, at PSC's request, Emergent immediately provided PSC with $3.5 million in an effort to keep the company afloat as the parties moved toward the closing of the asset purchase. Over the next three months, Emergent provided an additional $6.5 million to PSC to those same ends.

### Mr. Adams and Dr. Cox Obstruct Emergent's Due Diligence

21. Following the Loan Agreement, Emergent continued its diligence efforts as needed for the asset purchase transaction. Even though Emergent was funding PSC's operations as provided for in the Loan Agreement, Mr. Adams and Dr. Cox systematically obstructed the due diligence process throughout the Spring of 2008; Emergent became aware of some of these diligence failures during the Spring but several were hidden until later. Although Emergent ultimately obtained the due diligence that it required to proceed with the deal at the time, Mr. Adams and Dr. Cox created obstacles that prevented Emergent from obtaining that information in a timely and efficient manner and failed to provide additional information that Emergent sought to facilitate the deal.

22. One example of the due diligence challenges created by Mr. Adams and Dr. Cox is their withholding of important pieces of information from us during

the early stages of the due diligence process.  For instance, Mr. Adams failed to inform me on a timely basis that he made the decision to expand PSC's operations into a facility without first signing a written lease agreement for the space and without obtaining approval from PSC's Board of Directors.  Similarly, Mr. Adams and Dr. Cox failed to inform me that PSC had entered into a manufacturing agreement with another company that might have undermined PSC's ability to manufacture FluBlok.  Emergent only learned of this agreement days before the Asset Purchase Agreement ("APA") between PSC and Emergent was signed.  In addition, despite repeated requests, PSC never delivered the definitive information that it provided to the Department of Health and Human Services in support of its proposed contract award from the Biomedical Advanced Research and Development Authority ("BARDA") for FluBlok.

23.     Also during the diligence process, Adams directly lied to me about taking money for PSC from another pharmaceutical company.  On April 22, 2008, I and other Emergent representatives met with Mr. Adams and others from PSC.  During that meeting, I and others at Emergent pressed Mr. Adams for an explanation of $1 million in funds that PSC had received via wire transfer into its corporate bank account.  Mr. Adams requested to speak to me in private and during that conversation told me that PSC had desperately needed money, and so he had transferred money out of his children's trust fund to finance PSC's ongoing operations without proper authorization.  He further advised me that no one at PSC was aware of this transaction and requested that I keep the information confidential.

24.     I accepted Mr. Adams's explanation as it seemed to me not the type of thing a father would lie about.  I told him that we would address repayment of those funds as no one should have to use their children's trust money to keep their company afloat.  I immediately shared Mr. Adams's explanation with my colleagues, who informed me that Mr. Adams's story was a lie.  While I was speaking privately with Mr. Adams, they had discovered that the funds were in fact from "GSK," which we immediately understood to mean one of the world's largest pharmaceutical companies, GlaxoSmithKline.  Emergent was able to uncover the relevant underlying information, but not because of Mr. Adams; if Emergent had not investigated further, it would not have discovered the lie.

25.     Subsequent to that meeting, William Narwold, who was then the Chairman of PSC's Board of Directors, told me that Mr. Adams had acted improperly and had "done something he should not have done," but told me that the GSK transaction would not affect the planned transaction with Emergent.

26.     During due diligence, Adams also made misrepresentations concerning FluBlok.  He misrepresented the development status of FluBlok, specifically that it would be ready for market by 2008 (it is still not on the market). He also misrepresented the magnitude and expected timing of the funding from BARDA, stating that it would arrive by mid-2008 (it came a full year later).

### Mr. Adams and Dr. Cox Secretly Work to Undermine the Deal Even While Withdrawing Loan Funds from Emergent

27.     On May 26, 2008, Emergent and PSC entered into the APA regarding Emergent's acquisition of PSC's assets.  Mr. Adams and Dr. Cox then undertook a secret campaign to make sure the transaction would not close.  These efforts

were not revealed to me or others at Emergent until after the damage was done, and some long afterwards.

28. In the weeks leading up to the shareholder vote, I learned that Mr. Adams told PSC shareholders that they would not gain "anything" from the planned asset purchase. Additionally, major PSC shareholder Henry Zachs told me that PSC management had told him that FDA approval for FluBlok and a $150 million federal grant were "just around the corner," and so he felt that shareholders should hold out and not approve the transaction with Emergent. I also learned from my colleagues at Emergent that Adams was maligning the transaction in conversations with shareholders who he was supposed to be contacting to solicit support.

29. A year later, I learned that Dr. Cox had participated in similar efforts to sabotage the planned June 2008 shareholder vote on the asset purchase transaction. In a related litigation, a PSC shareholder produced a two-page, single-spaced email sent by Dr. Cox in June 2008 prior to the scheduled shareholder vote and days before PSC would draw down on the last $2 million in bridge financing. In the email she urged shareholders to "vote AGAINST the transaction" and presented multiple reasons for doing so that disparaged Emergent and were untrue.

30. Among other things, in that email, Dr. Cox disparaged Emergent, writing that "the FDA has expressed concern that the take-over by [Emergent] will negatively interfere with [FluBlok] approval." Neither the FDA nor Dr. Cox has ever suggested such a thing to me, and I have never heard any basis for this

allegation.  Dr. Cox also wrote that "[Emergent] retained only 20% of the employees [of another acquisition] once they took over."  In addition to this statement being factually inaccurate, Dr. Cox was well aware that I had personally represented to all PSC employees that they would have a job for at least a year following the transaction with Emergent, a promise reflected in § 7.5(d) of the APA itself.

### The Shareholder Meeting Is Cancelled And The Asset Purchase Transaction Falls Apart

31. The day before the planned June 23, 2008 vote, I learned from Mr. Narwold that PSC intended to adjourn the meeting, and no shareholder vote on the asset purchase occurred.  The meeting was never rescheduled.

32. After the failed shareholder meeting, PSC's management demanded that Emergent provide additional financing to sustain PSC's operations.  Because Emergent had no further financing obligations under its agreements with PSC and because of the duplicitous efforts of Mr. Adams and Dr. Cox to scuttle the deal, there was no way to justify the continued funding of PSC by Emergent absent a clear path forward to closing the transaction.

33. Emergent then brought suit against PSC, Mr. Adams, and Dr. Cox in July 2008, alleging, among other claims, that Mr. Adams and Dr. Cox had defrauded Emergent by falsely representing to Emergent their support and cooperation with an asset purchase transaction in order to induce Emergent to loan $10 million to PSC to fund its operations purportedly until the asset purchase transaction could close.

34. Over the next several months, beginning almost immediately after

the failed shareholder meeting in June and continuing through the end of 2008, I worked extensively with Mr. Narwold to negotiate a transaction between PSC and Emergent that was an alternative to the asset purchase deal that the companies had previously negotiated. I continued to pursue a transaction with PSC in part because I understood from Mr. Narwold that the Board of PSC was concerned about PSC's ability to repay Emergent's $10 million loan and Emergent needed to do what it could to protect these funds. Ultimately, however, Emergent decided not to proceed with a transaction with PSC and ended talks in January 2009 without a deal.

35. Around this time, I raised the issue of the repayment of the $10 million loan at a meeting with Mr. Adams (among others) and was advised that PSC could raise the money needed for repayment but needed several months in which to do so. In order to give PSC the opportunity to raise these funds, Emergent and PSC entered into a series of forbearance agreements; under the latest agreement, the Amended and Restated Forbearance Agreement, Emergent agreed to refrain from collecting on its loan to PSC until May 31, 2009. PSC ultimately failed to repay Emergent any portion of the loan by this deadline, however. To date, PSC has not repaid any portion of the $10 million loan.

### Emergent's Damages Resulting from the Deceptive Conduct of Mr. Adams and Dr. Cox

36. Emergent has suffered damages by proceeding with the $10 million bridge loan and pursuing the asset purchase of PSC based on its reliance on Mr. Adams's and Dr. Cox's representations concerning the deal. *First*, by providing the bridge loan, Emergent has suffered the loss of loan principal with accrued

interest.  *Second*, Emergent incurred costs when we moved forward in the Spring of 2008 with the doomed asset purchase (including the costs and fees for attorneys, bankers, accountants, consultants, and other vendors who worked on the planned asset purchase, as well as the cost of Emergent employees' time in pursuing the asset purchase transaction (including the costs of due diligence)).  *Third*, when the deal fell apart and the fraud was revealed to us, Emergent incurred expenses in its effort to be made whole.  These expenses include costs and fees associated with litigation to recover on the loan (either through repayment or replevin) and attempts to pursue alternative transaction structures.

       I hereby declare under penalty of perjury that the foregoing is true and correct.

Dated:    Rockville, MD
            August 3, 2010

                                              */s/ Daniel J. Abdun-Nabi*
                                              Daniel J. Abdun-Nabi

**CERTIFICATION OF SERVICE**

This is to certify that on this date, a copy of the foregoing Declaration of Daniel J. Abdun-Nabi was filed electronically and served by mail on any party or counsel unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the court's CM/ECF System.

Dated:      New York, New York this 6th day of August, 2010


By: /s/  Catherine Marlantes Rahm