### Page 1

```
          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF CONNECTICUT
_____
EMERGENT BIOSOLUTIONS, INC.     CIVIL ACTION NO.
   Plaintiff
     against
DANIEL D. ADAMS and
MANON M.J. COX
   Defendant
_____

             Deposition of Denise Esposito
                    Washington, D.C.
                     May 20, 2010


Reported by: Bonnie L. Russo
Job No. 143282
```

### Page 2

```
                    May 20, 2010
                    10:02 a.m.



     Deposition of Denise Esposito held at:


     Wilmer Cutler Pickering Hale and Dorr, LLP
        1875 Pennsylvania Avenue, N.W.
              Washington, D.C.






  Pursuant to Notice, when were present on behalf
  of the respective parties:
```

### Page 3

1  APPEARANCES:
2
3  For the Plaintiff:
4      ANNE SMALL, Esq.
5      CATHERINE MARLANTES RAHM, Esq.
6      WILMER CUTLER PICKERING HALE AND DORR, LLP
7      399 Park Avenue
8      New York, New York 10022
9      212-937-7213
10
11 For the Defendants:
12     STEVEN JOHNSON, Esq.
13     DEREK McNALLY, Esq.
14     KENNEDY JOHNSON GALLAGHER, LLC
15     99 Wall Street
16     15th Floor
17     New York, New York 10005
18     212-248-4820

### Page 4

```
           C O N T E N T S
EXAMINATION OF DENISE ESPOSITO          PAGE
BY MR. JOHNSON                           6

              EXHIBITS
1    Complaint                           15
2    Letter dated 2-5-08                 33
3    Loan and Security Agreement         37
4    Project Platypus                    66
     Discussion Materials
5    Asset Purchase Agreement            84
6    Project Platypus Presentation       97
     to the Board of Directors
7    Letter dated 7-30-08               154
8    E-Mail Chain dated 2-28-08         156
9    E-Mail Chain dated 6-18-08         172
10   E-Mail Chain dated 6-19-08         174
11   Protein Sciences Corporation       190
     Notice of Joint Special and
     Annual Meeting of Stockholders
     to be held on 6-23-08
12   Due Diligence Plan                 252
```

57

1   She clearly had been working hard, and I told
2   her that our goal was to minimize her
3   involvement and the time commitment, but that
4   since she seemed to control the documents and
5   the people, we needed to talk to her.
6        She said to me, I can't talk until I
7   have money.  My bank account is empty.  I am
8   trying to get a BLA filed and again, I told her
9   that I understood, and we were prepared to fund
10  a loan.  I think I even told her at that point
11  that we had prepared a draft of the loan and
12  security agreement, and that there was
13  diligence required.
14       I then said to her, you know, as I'm
15  sure you understand as a public company, we
16  can't responsibly extend millions of dollars to
17  you without minimal diligence.
18       She told me I knew nothing about
19  running a public company, that she had been
20  running public companies for 20 or 30 years or
21  that she has extensive experience with public
22  companies, and that she wanted an advance

58

1   before they would participate in diligence.
2        I told her that was not the
3   structure of the deal.  She then told me that
4   she thought the deal stunk or stinks.  I don't
5   know if she used that word or something
6   stronger than that.  She told me that she had
7   looked at the letter of intent and needed the
8   transaction, and that I would be hearing from
9   her on a proposed structure that was acceptable
10  to her.
11       I told her that if she had a
12  proposed structure in mind on behalf of the
13  company, that she needed to tell us.
14  Otherwise, we were proceeding -- and Dan Adams
15  was in the room.  We were proceeding as set
16  forth in the LOI, and that we needed her
17  cooperation or we couldn't fund.  Nothing
18  productive was accomplished in that meeting.
19       She was very angry at that and she
20  ultimately stood up and stormed out, so she did
21  not provide me with any substantive information
22  or documentation.

59

1        At the end of that meeting, Dan
2   Adams, who appeared very flustered to me, asked
3   me to take a walk.  He said -- he asked me if I
4   wanted a tour of the facility.  I had missed
5   the morning facility tour because I came late,
6   and I agreed, and as soon as we got in a
7   relatively private space -- in fact, it was the
8   manufacturing suite, he apologized for Manon's
9   behavior.  He told me that she is very direct,
10  and that she is very stressed and busy.
11       He told me that she had her heart
12  set on an out-licensed transaction to major
13  pharma.  She thought that was where this should
14  go, that she had no interest in doing a deal
15  with -- that was a sale to a midsize biotech
16  company, but that she had to understand they've
17  reached the end of the road, and he told me --
18  his words were, she'll come around.
19       Q.   So you knew, at least as of
20  February 27th, that Manon Cox was not in favor
21  of a sale to Emergent; is that fair?
22       A.   I did.

60

1        Q.   And Dan Adams indicated to you that
2   he hoped she would come around?
3        A.   No, he indicated to me that she
4   would come around.  What I understood him to
5   mean was that there were no other alternatives
6   and that the board, and he accepted -- and he
7   told me that there was not another alternative.
8   She needs to accept that there is not another
9   alternative.  She will come around.  I didn't
10  know whether she would or not.  That was my
11  first meeting with Manon.
12       Q.   Now, at this time, wasn't it a fact
13  that it had not yet been determined whether
14  this would be a stock deal or an asset
15  purchase?
16       A.   That is not the case.  It was -- the
17  LOI was drafted as an asset purchase, and that
18  was what Emergent was willing to do at that
19  time.
20       Q.   Doesn't the LOI specifically state
21  it was going to be either a stock purchase or
22  an asset purchase?